UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X

JERRY MCBEE,

Petitioner,

**REPORT & RECOMMENDATION**
**05 CV 4752 (DLI) (LB)**

-against-

SUPERINTENDENT JOHN BURGE,

Respondent.

---------------------------------------------------------X

BLOOM, United States Magistrate Judge:

Jerry McBee ("McBee" or "Petitioner") petitions this Court seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Honorable Dora L. Irizarry, United States District Court Judge, referred this petition to me for a Report and Recommendation in accordance with 28 U.S.C. § 636(b). For the reasons set forth below, it is respectfully recommended that the petition should be denied.

## BACKGROUND

On February 11, 1998, at approximately 7:00 p.m., two men entered a laundromat located at 469 Vermont Street in Brooklyn, New York. (Tr. 795-796, 798.)[1] The owners of the laundromat, Lucien Michel and his wife Suzette Michel, had locked the front door to prevent any new customers from entering, although the nine customers already inside were permitted to finish their washes. (Id.) The two men had entered when a customer unlocked the front door to exit. (Tr. 796, 806, 812, 815.) One of the men proceeded to the rear of the laundromat and asked Lucien Michel for change of a dollar. (Tr. 796-799, 807.) Michel gave the dollar to his wife,

---

[1] "Tr." refers to the transcript of the jury trial held April 24 - 30, 2001 (Respondent's Exhibits H - J).

who made change. (Tr. 799, 807, 812-813.) As Michel was about to give the man change, the man drew a gun and commanded Michel not to move. (Id.) Michel, however, punched the man and the two began to fight. (Tr. 799-801.) Michel and the man exchanged blows, at which point Mrs. Michel struck the man in the back, causing him to drop the gun into a laundry cart. (Tr. 813-815.) The man retrieved the gun and walked backward toward the exit while pointing the gun at Mr. and Mrs. Michel. (Tr. 802, 813-814.) The man, and his accomplice, who had been standing by the front door during the struggle, exited the laundromat and fled the scene. (Tr. 752, 757.) Mrs. Michel restrained Mr. Michel from pursuing the men and called 911. (Tr. 803, 808, 815-816.) While Mrs. Michel was restraining Mr. Michel, she heard a single gun shot. (Tr. 815-816.)

While Michel and the man fought at the back of the laundromat, a customer, Otis Walls, along with several other customers, ran toward the front door to exit the laundromat. (Tr. 751, 756, 759-60.) Walls heard a gun shot as he was running toward the door. (Tr. 751.) Once outside, Walls saw the two men fleeing from the scene. (Tr. 753, 758.) Walls called 911 and then returned to the laundromat and saw Linda Sanders lying face down in a pool of blood. (Tr. 752-754.) Sanders had been shot with a .44 caliber gun on the right side of her head. (Tr. 789-793, 905-912.) She died on the scene. (Id.)

No witness placed petitioner at the scene. There was no physical evidence tying petitioner to the crime. However, on February 19, 1998, eight days after Sanders was shot and killed, Detective Steven Amalfitano interviewed David Tyson, who lived down the block from the laundromat. (Tr. 663, 696.) Tyson told Amalfitano that a man with the nickname "Black" had participated in the attempted robbery at the laundromat. (Tr. 664.) Amalfitano did not show Tyson a photograph of petitioner, nor did he ask whether petitioner was the "Black" he was

referring to who had participated in the attempted robbery. (Tr. 698.) However, at trial, over the defense's objection, the court allowed Amalfitano to testify that Tyson had stated both that "Black" was involved in the laundromat robbery and that "Black hung out in Miller Park," which the prosecutor established was a few blocks away from petitioner's residence. (Tr. 728.) Amalfitano also testified that Tyson told him that he had spoken to "Black" on the day of the shooting and that "Black was crying and he was talking about the robbery at the laundromat and that no one was supposed to get hurt." (Tr. 728-729.) Tyson did not testify at petitioner's trial.

In September 1998, Amalfitano and Detective Richard Ockovic interviewed petitioner's cousin, Lamont Beasley, who was an informant for the Federal Drug Enforcement Administration. (Tr. 665-701; 853-853.) At trial, over the defense's objection, Amalfitano, and then Ockovic, testified that Beasley provided them with the names of four individuals involved in the attempted robbery and shooting at the laundromat; petitioner was one of the four. (Tr. 666-667.) Beasley, like Tyson, did not testify at trial.

On February 2, 1999, Ockovic and another detective located petitioner. (Tr. 855.) Petitioner was taken to the 75th Precinct for questioning and given his Miranda warnings, which he waived. (Tr. 670-672, 701-702, 856, 860, 862.) Petitioner told Amalfitano and Ockovic that his nickname was "Black." (Tr. 682.) After several hours of interviews, petitioner provided two written confessions and a video-taped confession. He was also shown a photo array from which petitioner identified the other individuals involved in the attempted robbery. (Tr. 683-685.) In the first confession, petitioner explained the robbery plot and also explained that his role was to "stand out front" of the laundromat, presumably as a lookout. (Tr. 678-680.)

After obtaining the first written confession from petitioner, Amalfitano called the District Attorney's Office and spoke with Assistant District Attorney Don Savatta. (Tr. 685-686, 892-

893.) Savatta reviewed the case and petitioner's first confession and requested that Amalfitano and Ockovic ask petitioner a few more questions. (Tr. 687, 713-714.) Petitioner then made a second written confession. (Tr. 713-717.) In the second confession, petitioner stated that he "stayed outside [the laundromat] on the corner of Vermont and Blake looking up and down the block for the police." (Tr. 727.) Petitioner then agreed to speak to Savatta and was aware that the conversation would be videotaped. (Tr. 691.) After petitioner's statement was videotaped, petitioner was placed under arrest. (Tr. 692.)

At trial, Ebony Lilly testified that a week before the attempted robbery and shooting at the laundromat she heard petitioner talking "about the laundromat." (Tr. 938, 951.) Two days after the shooting, Lilly testified she asked petitioner about what happened at the laundromat and petitioner told her it was "his work." (Tr. 941.) One week later, after learning that the victim was her uncle's girlfriend, Lilly confronted petitioner. (Tr. 943-944.) Petitioner told Lilly that Sanders was killed because she "shouldn't have ran her mouth." (Tr. 945.) Lilly also testified that petitioner used the nickname "Black." (Tr. 936-938.) On cross-examination, Lilly admitted that she had been arrested for cashing bad checks, and that she was testifying in exchange for the prosecutor's assistance to help relocate her mother to live closer to her. (Tr. 961-962.) Lilly also testified that she never told anyone about her conversations with petitioner and that she remained friends with another man who was involved in the shooting at the laundromat. (Tr. 942, 948, 945.)

## PROCEDURAL HISTORY

Petitioner was tried three times. Petitioner's first trial ended in a mistrial in June of 2000 when the jury failed to reach a unanimous verdict. (Respondent's Exhibit D.) At the second trial,

in November of 2000, the court declared another mistrial after an Allen charge failed to break the jury's deadlock. (Respondent's Exhibit E.) At the third jury trial on April 30, 2001, petitioner was convicted in New York State Supreme Court, Kings County, of Murder in the Second Degree (felony murder) under New York Penal Law § 125.25(3), and Attempted Robbery in the First Degree under New York Penal Law §§ 110/160.15(2). (Tr. 1063, 1065, 1083.) On May 22, 2001, petitioner was sentenced to consecutive terms of imprisonment of twenty years for Second Degree Murder and ten years for Attempted Robbery. (Respondent's Exhibit K.)

Petitioner, with the assistance of counsel, appealed from the judgment of conviction to the New York State Supreme Court, Appellate Division, Second Department and raised the following grounds: (1) petitioner's Sixth Amendment rights were violated by the admission of the police's testimony regarding statements made by non-testifying witnesses; (2) prejudice by the admission of references to petitioner's criminal history; and (3) the court erred in sentencing petitioner to consecutive, rather than concurrent, sentences. (Respondent's Exhibit L.) Petitioner filed a supplemental *pro se* brief alleging that his right to due process was denied because he was not present during a portion of the Sandoval hearing and because the prosecutor failed to provide Rosario material relating to Ebony Lilly's testimony. (Respondent's Exhibit N.)

The Appellate Division, Second Department, affirmed the judgment of conviction on January 14, 2004. People v. McBee, 8 A.D.3d 500 (2d Dep't 2004). With respect to petitioner's claims that the court admitted hearsay evidence from non-testifying witnesses in violation of petitioner's Sixth Amendment rights, the court assumed that the statements were impermissible testimonial evidence and that petitioner's confrontation rights were violated. Id. at 501. However, relying on People v. Crimmins, 36 N.Y.2d 230 (1975), the court applied a harmless error analysis, and found that the constitutional error was harmless beyond a reasonable doubt.

People v. McBee, 8 A.D. 3d at 501. The Second Department further found that petitioner's other claims regarding the admission of his criminal history and the Rosario claims (raised *pro se*) "are unpreserved for appellate review or without merit."[2] Id.

The Second Department modified petitioner's sentence by directing that the sentence for Murder in the Second Degree and Attempted Robbery in the First Degree run concurrently with each other, but otherwise affirmed the conviction. Id. The New York State Court of Appeals denied petitioner's application for leave to appeal on July 23, 2004. People v. McBee, 3 N.Y.3d 660 (2004). No petition for certiorari to the Supreme Court of the United States was sought nor did the petitioner collaterally attack his conviction in the state courts. The instant Petition was filed on September 27, 2005. On October 17, 2006, Brooklyn Law School Legal Services Corp. appeared as counsel for petitioner.[3]

## DISCUSSION

### Standard of Review

Petitioner's claims are governed by the standards set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. §2254. For claims that have been adjudicated on the merits in state court proceedings, a petitioner must show that the state court proceedings:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[2] Defendant does not raise either of these claims in the instant petition. The Sixth Amendment violation is the sole claim petitioner raises.

[3] The Court acknowledges the exemplary work of petitioner's pro bono counsel, law students at Brooklyn Law School under the supervision of Professor Ursula Bentele.

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In order to be entitled to AEDPA's deferential review, the state court is required to have reached the merits of the constitutional claim. Norde v. Kean, 294 F.3d 401, 409 (2d Cir. 2002). In order to determine whether a state court reached an issue on the merits, this court must weigh the following factors: "(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits." Sellan v. Kuhlman, 261 F.3d 303, 314 (2d Cir. 2001). If the state court did not reach the merits of the claim, then the court reviews the state court's ruling *de novo,* a less deferential standard. Norde, 294 F.3d at 409.

The Second Circuit has instructed that a "claim need not be addressed in detail by a state court to have been 'adjudicated on the merits.'" Howard v. Walker, 406 F.3d 114, 122 (2d Cir. 2005) (citing Ryan v. Miller, 303 F.3d 231, 245-46 (2d Cir. 2002)). In fact, all a state court is required to do is to "dispose of the petitioner's federal claim on substantive grounds, and reduce that disposition to judgment. No further articulation of its rationale or elucidation of its reasoning process is required" Aparicio v. Artuz, 269 F.3d 78, 93 (2d Cir. 2001).

In this case, the Appellate Division "assumed" that petitioner had established a Sixth Amendment violation under Crawford v. Washington, 541 U.S. 36 (2004), and went on to determine whether the constitutional violation was harmless beyond a reasonable doubt. Petitioner erroneously contends that because the Appellate Division "assumed" a Confrontation

Clause violation, without addressing it in detail, that the state court's decision regarding the Confrontation Clause should be reviewed under a *de novo* standard. Petitioner concedes the state court's harmless error analysis should be accorded AEDPA deference.[4] (Petitioner's Supplemental Memorandum of Law "Suppl. Memo" at 15.) The Appellate Division's "assumption" that petitioner's Sixth Amendment rights were violated did not rely on a state procedural ground. The state court considered petitioner's Confrontation Clause claims under Crawford v. Washington, 541 U.S. 36 (2004), and "assumed" that the "statements made to the detectives could be characterized as impermissible testimonial statements." McBee, 8 A.D.3d at 500-501. Under such circumstances, the state court decision "assuming" a Confrontation Clause violation was made on the merits and AEDPA deference applies. Jimenez v. Walker, 458 F.3d 130, 146 (2d Cir. 2006) (generally, when a decision is not explicitly decided on procedural grounds, the court should assume it was decided on the merits).

A state court decision is "contrary to" clearly established federal law if a state court: (1) "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law;" or (2) "decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 402, 405 (2000). Under the "unreasonable application" clause of the AEDPA, habeas relief is warranted only "if the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." Taylor, 529 U.S. at 407.

The Supreme Court has ruled that the reasonableness of the application of the law is to be

---

[4] Petitioner's initial *pro se* submission argued that the Confrontation Clause violation constituted *per se* reversible error. The Supreme Court "rejected the argument that the Constitution requires a rule of automatic reversal in the case of constitutional error, and concluded instead that 'there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless.'" Brecht v. Abrahamson, 507 U.S. 619, 630 (1993) (quoting Chapman v. California, 386 U.S. 18, 22 (1967)). Pro bono counsel's supplemental memorandum of law in support of the Petition affords the proper AEDPA deference to the state court's harmless error analysis.

assessed objectively rather than subjectively. Id. at 409-10. In addition, the Court cautioned that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." Id. at 410 (emphasis in original). Therefore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; accord Bell v. Cone, 535 U.S. 685, 694 (2002); see Schriro v. Landrigan, 550 U.S. 465, 127 S.Ct. 1933, 1939 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold."); see also Sorto v. Herbert, 497 F.3d 163, 169 (2d Cir. 2007) ("While the precise method for distinguishing objectively unreasonable decisions from merely erroneous ones is somewhat unclear, it is well-established in this Circuit that the objectively unreasonable standard of § 2254(d)(1) means that petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief.") (internal citations and quotations omitted).

**Petitioner's Sixth Amendment Claim**

It is a violation of the Confrontation Clause to admit a declarant's testimonial statement against a defendant unless the witness is unavailable to testify and the defendant has had the opportunity to cross-examine the declarant. See Crawford v. Washington, 541 U.S. at 68-69 (2004) ("Where testimonial statements are at issue, the only indicium of reliability sufficient to

satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.").[5] Statements are testimonial "where the declarant would reasonably expect that his or her responses [to questioning] might be used in future judicial proceedings." United States v. Saget, 377 F.3d 223, 228 (2d Cir. 2004). "Whatever else the term [testimonial] covers, it applies at a minimum. . . to police interrogations." Crawford, 541 U.S. at 68; see also U.S. v. Logan, 419 F.3d 172, 177 (2d Cir. 2005) ("[u]nsworn statements elicited by police officers in the course of an interrogation are considered testimonial for Confrontation Clause purposes.").

Petitioner points to four statements that were admitted at his trial which violated his Sixth Amendment rights: (1) Amalfitano's testimony that Tyson told him that petitioner's nickname was "Black" (Suppl. Memo at 16); (2) Amalfitano's testimony that Beasley named four individuals for the police to investigate, including petitioner (Id.); (3) Ockovic's testimony that Beasley named four individuals for the police to investigate, including petitioner (Id. at 17); (4) Amalfitano's testimony on redirect that Tyson told him on the day of the attempted robbery "Black was crying and he was talking about the robbery at the laundromat and that no one was supposed to get hurt." (Id. at 25.) Respondent concedes that the statements were "arguably testimonial" in that they were made "in response to questions by police officers during the course of the investigation" and the declarants "could have reasonably believed that their responses would be used in a judicial proceeding." (Affirmation in Opposition to Petition for a Writ of Habeas Corpus "Affirmation in Opp." at 22.) However, respondent maintains that statements (1),

5 Crawford applies here because petitioner's conviction was not final in 2004 when Crawford was decided. In cases on federal habeas review, "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Teague v. Lane, 489 U.S. 288, 310 (1989). State convictions are final "for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied."Beard v. Banks, 542 U.S. 406, 411 (2004)(citations omitted); See also U.S. v. Becker, 502 F.3d 122, 129 (2d Cir. 2007) (petitioner "still had time to petition the Supreme Court for certiorari when Crawford was decided and, accordingly, his conviction had not become final for purposes of Teague.")

(2) and (3) did not violate petitioner's Sixth Amendment rights under Crawford because the statements were not admitted for the truth of the facts asserted, but rather to "explain how the [police] investigation led" to petitioner. (Affirmation in Opp. at 23.) The Court emphatically disagrees.

The Second Circuit has noted that "[p]ost- Crawford, the admission of non-testifying informants' out-of-court testimonial statements, through the testimony of police officers, is a recurring issue in the courts of appeals." U.S. v. Mejia, 545 F.3d 179, 199 (2d Cir. 2008) (citation omitted). This Court finds that even if the statements here were not admitted for the truth, but rather to show the investigatory steps taken by the police which led them to petitioner, this was a violation of petitioner's confrontation rights. Under the Federal Rules of Evidence, hearsay evidence not offered for its truth may only be received in limited circumstances as background information "(1) to 'clarif[y] noncontroversial matters without causing unfair prejudice on significant disputed matters,' and (2) as 'appropriate rebuttal to initiatives launched by the defendant.'" U.S. v. Paulino, 445 F.3d 211, 218-219 (2d Cir. 2006) (citing Ryan v. Miller, 303 F.3d 231, 252-53 (2d Cir. 2002). Neither exception applies here. The testimonial statements of Tyson and Beasley introduced through the two police officers, Amalfitano and Ockovic, did not clarify non-controversial matters and were not properly introduced as evidence. See U.S. v. Johnson, 529 F.3d 493, 501 (2d Cir. 2008) (Where the evidence sought to be justified as background in a non-hearsay application included hearsay which bore importantly on the guilt of the defendant, the illumination of the investigating agent's state of mind could not justify the admission of inculpatory hearsay) (citing United States v. Reyes, 18 F.3d 65, 70 (1994)). Furthermore, "[w]hen there is legitimate value to showing that the investigating agent was acting in response to information he had received, it is often possible to bring his receipt of that

information into evidence without including the portions that are prejudicial to the defendant on trial." Johnson, 529 F.3d at 500.

In this case, the police officers' testimony regarding what Beasly and Tyson told them should not have been admitted. The detectives' testimony about petitioner's involvement in the crime in question did not serve merely as "background." Amalfitano's testimony that Tyson provided the nickname "Black" did not "demonstrate how the investigation led to [petitioner]." In fact, it was after being taken into custody that petitioner confirmed he was called "Black." Both Amalfitano's and Okcovic's testimony that the informant, Beasley, who happened to be petitioner's cousin, provided four names to the police, including petitioner's name, was not merely background information.[6]

Moreover, Amalfitano's and Ockovic's testimony regarding what they were told by Tyson and Beasley – that petitioner was involved in the attempted robbery and shooting at the laundromat – was used by the prosecution in both its opening and summation. After explaining the crime, the prosecutor stated:

> "So the only real question for each one of you as jurors is what was the defendant's involvement? Was he an active and willing participant who acted together with the other members of his crew in the attempted robbery of that laundromat? And I suggest to you the answer to that question is a resounding yes. You know from Detective Amalfitano and Ockovic after the robbery it wasn't even a week they first got information from a guy named David Tyson who told him he spoke to a guy named Black in Miller Park, very close to the scene, very close to where the defendant lives. And he talked about his participation in the robbery. And then you know about six or seven months later while they were still trying to figure out who the Black was, as the detectives told you it is a

6 Respondent argues that the trial court instructed the jury to use the statements to explain the actions of the police leading up to the arrest and not to use the statements to establish the truth of the matter asserted. (Affirmation in Opp. at 23.) However, Beasley's statement against petitioner directly inculpated him in the crime. Furthermore, the Court's instructions "did not clearly explain the difficult mental task of considering information for one purpose but not for another," U.S. v. Reyes, 18 F.3d 65, 71 -72 (2d Cir. 1994), rather the instructions just reiterated that the jury should not consider the statements for the truth of the matter asserted. (Tr. 664, 667, 853, 1044-45.)

common nickname, in September they go to look for Lamont Beasley who was this defendant's cousin. As they came away from that interview, now they had very specific information. They now had four targets focused from their investigation. You know who they were: George Russing, Jeff McKenzie, Timothy Batita, and this defendant, Jerry McBee."

(Tr. 1010-1011.) The prosecutor made similar statements in her opening. (Tr. 612-613.) Tyson's and Beasley's statements were introduced to establish petitioner's involvement in the attempted robbery and shooting at the laundromat. Since neither Tyson nor Beasley testified, petitioner's Sixth Amendment right to confront these witnesses was violated. Mejia, 545 F.3d at 199 (finding that expert testimony by police officer which relied on and repeated "out-of-court testimonial statements made by individuals during the course of custodial interrogations" violated defendants' rights under the Confrontation Clause).

Respondent's assertion that Amalfitano's testimony on redirect did not violate the Confrontation Clause because petitioner's attorney "opened the door" is unavailing. Petitioner's attorney asked Amalfitano whether Tyson actually identified petitioner as the individual with the nickname "Black" in question. The prosecution then introduced the disputed statements by Tyson, that on the day of the crime, Black was crying that nobody was supposed to get hurt during the robbery at the laundromat. (Tr. 727-729.) Respondent cites to a Sixth Circuit case from 1988 to support its proposition that "[a] defendant can waive his right to confrontation by opening the door to hearsay testimony." (Affirmation in Opp. at 24.) (citation omitted). Perhaps that was the law in the Sixth Circuit in 1988, but it is certainly not the law since Crawford. Although the Supreme Court has not addressed whether a defendant may "open the door" to the admission of testimony that would otherwise violate the Confrontation Clause, Ko v. Burge, No. 06 Civ. 6826 (JGK), 2008 WL 552629, 13 (S.D.N.Y. February 26, 2008), Crawford prohibits

such testimony regardless of the evidentiary rules that may otherwise permit its admission. Crawford, 541 U.S. at 61 ("[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence").

Respondent argues that "[w]ithout this redirect testimony the jury would have been left with the misleading impression that Tyson had no basis for implicating 'Black' in the crime." (Affirmation in Opp. at 25.) Although "[r]edirect examination may be used to rebut false impressions that arise from cross examination," U.S. v. Al-Moayad, 545 F.3d 139, 168 (2d Cir. 2008) (citing United States v. Wiley, 846 F.2d 150, 156 (2d Cir.1988) (internal citations omitted)), the testimony on redirect was not used to rebut any false impression. Petitioner here asked Amalfitano whether in the detective's experience, was Jerry McBee the only person in Brooklyn with the nickname "Black." (Tr. 698.) There was no false impression to clarify. Moreover, even if there was a false impression, the prosecutor's question on redirect, "what, if anything, was said about the laundromat robbery" does not clarify whether petitioner was the person with the nickname "Black." The state court did not carefully limit the evidence presented on re-direct, nor did the court instruct the jury that Amalfitano's testimony regarding Tyson's statements should not be taken for the truth.

Although a court may employ the "curative admissibility" doctrine, which gives a trial court discretion "to permit a party to introduce otherwise inadmissible evidence [for its substance] on an issue (a) when the opposing party has introduced inadmissible evidence on the same issue, and (b) when it is needed to rebut a false impression that may have resulted from the opposing party's evidence," Llanos v. Goord, No. 06 Civ. 0261 (RJH)(AJP), 2006 WL 1981749, 17 (S.D.N.Y., July 14, 2006) (citing United States v. Rosa, 11 F.3d 315, 335 (2d Cir. 1993), cert.

denied, 511 U.S. 1042, 114 S.Ct. 1565 (1994) (citations omitted)), that is not what happened here. In this case, respondent fails to establish that petitioner elicited inadmissible evidence during his cross-examination, thereby triggering the doctrine of curative admissibility and opening the door for the government to introduce otherwise inadmissible hearsay on re-direct. See U.S. v. Al-Moayad, 545 F.3d at 169.

For all of these reasons, had the Appellate Division not assumed it, this Court would find that both Amalfitano and Okcovic's testimony at trial regarding Tyson and Beasley's statements violated petitioner's Sixth Amendment Confrontation Clause rights. However, as the state court assumed petitioner's Confrontation Clause rights were violated, the state court's decision was not contrary to or an unreasonable application of clearly established Federal law.

**Harmless Error**

In Crawford, Chief Justice Rehnquist's concurrence pointed to the Court's "implicit recognition" that any violation of the rule announced would be subject to harmless-error analysis. Crawford, 541 U.S. at 76; see also U.S. v. McClain, 377 F.3d 219, 222 (2d Cir. 2004) (violations of the Confrontation Clause, if preserved for appellate review, are subject to harmless error review); Bowen v. Phillips, 572 F.Supp.2d 412, 419 (S.D.N.Y. 2008) (Even when a Confrontation Clause violation has occurred, a habeas corpus petition cannot be granted if the error was harmless) (citing Fuller v. Gorczyk, 273 F.3d 212, 220 (2d Cir. 2001); Mingo v. Artuz, 174 F.3d 73, 78 (2d Cir. 1999)). To assess harmless error, courts apply the test of Brecht v. Abrahamson, 507 U.S. 619 (1993). Brinson v. Walker, 547 F.3d 387, 395 (2d Cir. 2008). Under the Brecht standard of review, petitioner is not entitled to relief based on trial error "unless [he] can establish that it resulted in 'actual prejudice.'" Brecht, 507 U.S. at 637. "[I]n § 2254

proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial injurious effect' standard set forth in Brecht, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in Chapman." Fry v. Pliler, --- U.S. ----, 127 S.Ct. 2321, 2328 (2007) (citations omitted).[7]

The Second Department found the error here harmless under the more stringent Chapman standard of review,[8] stating "in light of the overwhelming evidence of guilt in this case, there is no reasonable possibility that the error, if any, might have contributed to the defendant's conviction and thus was harmless beyond a reasonable doubt." People v. McBee, 8 A.D.3d at 501. Under Fry,[9] this Court must assess whether the constitutional error of admitting the detectives' statements had a substantial and injurious effect on the jury's verdict. The court must review the record "as a whole" to determine whether the error was harmless. Brecht, 507 U.S. at 638. On habeas review, the prosecution bears the burden of persuasion on the issue of harmless error. Fry, 127 S.Ct. at 2328 n. 3.

"Several factors are relevant when evaluating the error's likely impact: (1) the strength of the Government's case; (2) the degree to which the statement was material to a critical issue; (3)

---

7 This petition was supplemented and fully briefed prior to the Supreme Court's decision in Fry.

8 The Second Department used the standard of review set forth in People v. Crimmins, 36 NY2d 230, 237 (1975), which incorporates the Chapman standard, for reviewing constitutional errors for harmlessness. Gutierrez v. McGinnis, 389 F.3d 300, 308 (2d Cir. 2004).

9 The Court in Fry reasoned that the AEDPA is recognized for limiting rather than expanding the availability of habeas relief and it is implausible that the AEDPA replaced the actual prejudice standard of Brecht with the more liberal standard of unreasonableness under the AEDPA/Chapman. Fry, 127 S.Ct. at 2327. The Fry Court stated that it "makes no sense to require formal application of both tests (AEDPA/Chapman and Brecht) when the latter obviously subsumes the former." Id. "Therefore, if the reviewing court, in applying Brecht, finds that the constitutional trial error is not harmless because it had a 'substantial and injurious effect or influence in determining the jury's verdict,' then the state court unreasonably applied clearly-established federal law." A.S. Goldmen, Inc. v. Phillips, No. 05 Civ. 4385 (PKC)(AJP), 05 Civ. 5496 (PKC)(AJP), 2007 WL 2994453, 3 (S.D.N.Y. October 15, 2007).

the extent to which the statement was cumulative; and (4) the degree to which the Government emphasized the inadmissible evidence in its presentation of its case." Mejia, 545 F.3d at 199 (citing United States v. Reifler, 446 F.3d 65, 87 (2d Cir. 2006)). Though all of these factors are relevant, the strength of the Government's case is "probably the single most critical factor." Id.

Petitioner argues that "even strong evidence is not necessarily sufficient to render error harmless" and cites to Chapman. (Suppl. Memo at 33-35.) Petitioner states the prosecution in Chapman had a very strong case, including forensic evidence, an informant who said defendant confessed, evidence of an opportunity to commit the crime and consciousness of guilt. Nevertheless, the Supreme Court held that the strength of the evidence was not sufficient to avoid reversal for constitutional error. (Id. at 35.) The evidence in Chapman, however, did not include the defendant's own confession. The strength of the prosecution's case here centered on petitioner's written and videotaped confessions that he acted as the look out for the attempted robbery. These confessions, taken after petitioner was given his Miranda warnings, were sufficient to convict petitioner. See Haymon v. New York, 332 F. Supp. 2d 550, 558 (W.D.N.Y. 2004) (Confrontation Clause violation found to be harmless under Brecht standard where petitioner had confessed); see also Vachet v. West, No. 04 Civ. 0351 (JG), 2005 WL 740640 at *10 (E.D.N.Y. Mar 24, 2005) (Confrontation Clause error found harmless under Brecht where, among other things, petitioner confessed).

Petitioner signed two of his written confessions and one was videotaped. (Tr. 680, 688, 691.) Petitioner's confessions described his involvement in the attempted robbery and stated that he was aware that at least one of the participants had a .44 caliber handgun, that he "stood out front" and was "looking up and down for the police" and that he expected to receive an equal share of the robbery proceeds (Tr. 679, 727, 898; Affirmation in Opp. at 19 referring to People's

Exhibit 12). Petitioner's confession also "dovetailed with the eyewitness testimony of Lucien Michel, Suzette Michel and Otis Walls" (Affirmation in Opp. at 28) in that petitioner knew two perpetrators entered the laundromat (Tr. 679, 796, 798, 812, 815), the perpetrators did not have ready access to enter the laundromat (Tr. 679, 795-796) and the deceased was shot once by the perpetrator nearest to the front door (Tr. 679, 751). As petitioner's role in the attempted robbery and shooting was as the lookout, physical evidence tying petitioner to the crime would be unlikely. However, petitioner's knowledge of the weapon involved in the attempted robbery and shooting was corroborated with physical evidence, the .44 caliber bullet found in the victim Sanders' head. (Tr. 679, 829, 912.) Even without the testimony of detectives Amalfitano and Ockovic, the jury still had petitioner's confessions, which were corroborated by other testimony and physical evidence. Therefore the prosecution had ample evidence to convict petitioner. See Timberlake v. Taylor, No. 04 Civ. 2846 (LTS)(FM), 2008 WL 756160, 3 (S.D.N.Y. March 20, 2008) ("Although the admissions that petitioner made in his statements were alone sufficient to convict him, they were [also] extensively corroborated" and any "error that may have occurred at [] trial was harmless.")

"While the Crawford error is incontrovertible, a good deal of what the defense would have been able to accomplish through cross examination of the non-testifying [witnesses] was developed through the witnesses who did testify." A.S. Goldmen, Inc., 2007 WL 2994453 at *6. While Tyson and Beasley's statements implicated petitioner in the attempted robbery and shooting at the laundromat, they were in large part cumulative of other testimony. Federal courts have held Confrontation Clause violations to be harmless error when the evidence against the petitioner at trial was substantial and/or the improperly admitted testimony was cumulative of other admissible evidence. See Bowen v. Phillips, 572 F.Supp.2d 412, 419 (S.D.N.Y. 2008)

("'[E]rroneous admission of evidence does not warrant reversal if the error had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict.'")(citations omitted).

While Amalfitano's testified that Tyson told him that petitioner's nickname was "Black" (Tr. 664), Amalfitano also testified that petitioner stated his nickname was "Black" (Tr. 682). Amalfitano's statements that Beasley named petitioner as one of the four individuals involved and that Tyson stated that on the day of the attempted robbery Black was crying that no one was supposed to get hurt were essentially cumulative of Ebony Lilly's testimony. Lilly testified that she heard petitioner talking about the attempted robbery at the laundromat (Tr. 938, 951), that Sanders was shot because she "ran her mouth" (Tr. 945), and that petitioner used the nickname "Black" (Tr. 936-938). Although petitioner argues that Lilly was not credible, Lilly was subject to cross-examination and the jury assessed her credibility as a witness.

Furthermore, when the record is reviewed as a whole, the degree to which the prosecution emphasized the inadmissible evidence in its presentation of its case was minimal. While the prosecution mentioned the inadmissible statements in both the opening and closing (Tr. 612-613; 1010-1011), a majority of the opening and closing focused on petitioner's confession, and the testimony of other witnesses that corroborated petitioner's confession (Tr. 608-620; 1008-1039). The references to the improper statements were brief, especially in light of the length of the closing argument. "Given the overall strength of the prosecution's case" and the fact that "the prosecutor highlighted [the challenged evidence] as only one of several important pieces of evidence ... during [her] lengthy summation," Gutierrez v. McGinnis, 389 F.3d at 309, the admission of these statements was harmless error.

Applying Brecht to petitioner's claim, the Confrontation Clause violations did not have a

substantial and injurious effect or influence in determining the jury's verdict in light of the evidence against petitioner. Therefore, this Court should defer to the state court's decision that any error was harmless and the petition should be denied.

## CONCLUSION

Accordingly, it is respectfully recommended that petitioner's application for a writ of habeas corpus under 28 U.S.C. § 2254 should be denied. However, because petitioner has made a substantial showing of the denial of a constitutional right, a certificate of appealability should issue. 28 U.S.C. §2253(c)(2); Lucidore v. New York State Div. Of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000) (upholding issue of certificate of appealability upon finding of a substantial showing that a constitutional right had been denied).

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Any objections to this Report and Recommendation must be filed with the Clerk of Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. See 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72. Any request for an extension of time to file objections must be made within the ten (10) day period. Failure to file a timely objection to this Report generally waives any further judicial review. DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000); Spence v. Superintendent, Great Meadow Corr. Fac., 219 F.3d 162, 174 (2d Cir. 2000); see Thomas v. Arn, 474 U.S. 140, 155 (1985).

SO ORDERED.

/S/

LOIS BLOOM
United States Magistrate Judge

Dated: February 12, 2009
Brooklyn, New York